2010 Ark. App. 193

**Jason MARTIN, Appellant**

v.

**Brooks HALLUM and Sharon Hallum, Appellees.**

No. CA 09–258.

Court of Appeals of Arkansas.

Feb. 24, 2010.

Robert L. Beard, Jr., North Little Rock, for appellant.

Louis Anthony Etoch, Etoch Law Firm, Helena, for appellees.

COURTNEY HUDSON HENRY, Judge.

|1Appellant Jason Martin, a police officer employed by the Brinkley Police Department, appeals an order entered by the Monroe County Circuit Court denying his motion for summary judgment. For reversal, Martin contends that he is entitled to qualified immunity on the claims brought against him by appellees Brooks Hallum and Sharon Hallum. We agree that appellant is protected by immunity on all but a battery claim asserted by Sharon. Therefore, we affirm in part and reverse in part the denial of summary judgment.

The record reflects that Brooks and his wife, Tamara Hallum, are the parents of a daughter, D.H., who was five years old in May 2006. At that time, Brooks and Tamara were separated. On May 7, 2006, Brooks and Deborah Harding, a caseworker for the Arkansas Department of Human Services (DHS) in White County, entered into a safety plan with |2regard to D.H. According to this plan, Brooks agreed to supervise the child at all times and to prevent the child from being in the presence of D.F., Tamara's sixteen-year-old son from another relationship. Further, the plan recited Brooks's understanding that, if he did not follow the plan, the child would be taken into protective custody by DHS.

On May 8, 2006, Brooks filed an ex parte motion for emergency custody of D.H. in a divorce action that Brooks had filed against Tamara in 2004 in the Lonoke County Circuit Court. In this motion, Brooks requested custody based on the allegation that D.F. had sexually abused D.H. Deborah Harding provided an affidavit to support the motion, stating that an examination of the child at Arkansas Children's Hospital confirmed that the child had been sexually abused and that the safety plan was put into place based on the recommendation of the law enforcement officers who were investigating the allegation of abuse. Harding added that, if an emergency order were not entered, DHS would have no choice but to place a seventy-two-hour hold on the child. On that same day, the Lonoke County Circuit Court entered an ex parte order placing custody of D.H. in Brooks. The court allowed Tamara supervised visitation and directed that the child have no contact with D.F.

On May 15, 2006, the Lonoke County Circuit Court conducted a hearing on the custody matter. As reflected by an order entered on May 17, 2006, the court set aside the ex parte order granting Brooks custody and dismissed the divorce action for improper venue and for failure to prosecute under the provisions of Rule 41 of the Arkansas Rules of Civil Procedure.

|3The events that gave rise to this litigation occurred on May 16, 2006, the day after the custody hearing but the day before the Lonoke County Circuit Court entered its dismissal order. That afternoon, D.H. was playing in a softball game in Brinkley, which is in Monroe County. Before the game ended, Brooks left the ballpark to attend to a business matter. Brooks's departure left the child in the care of Sharon, his mother. Tamara and her sister, Tracy Johnson, called the Brinkley Police Department and asked specifically for Officer Martin to meet them at an apartment complex near the ballpark. Consequently, the dispatcher sent Officer Martin to the complex. The two women informed Officer Martin that they wanted to visit Tamara's child at the ball field and that they expected trouble.

This prediction came true. In Sharon's presence, Tracy picked up D.H. and gave

her to Tamara. Sharon and Tamara then engaged in a tug-of-war over the child. Officer Martin intervened and eventually gave D.H. to Tamara, who proceeded toward the apartment complex. Sharon followed, as did Officer Martin, who was joined by off-duty police officers Arnold Leon and Ed Randle, who happened to be at the ballpark. When Tamara arrived at the apartment complex, she and D.H. entered a black truck. As Tamara was driving away, a truck driven by Brooks struck the front of the black truck. The officers arrested Brooks on charges of driving on the wrong side of the road, assault, and endangering the welfare of a child. The officers also assembled Tamara, D.H., and Sharon at the police station and summoned DHS as well. DHS took D.H. into protective custody, and she remained in foster care pursuant to orders of the juvenile court in Prairie County until January 23, 2007, when [4]the court awarded Brooks custody. A district court ultimately dismissed the three charges levied against Brooks.

Thereafter, Brooks and Sharon filed suit against Officer Martin, asserting civil-rights claims against him in his individual capacity, as well as simple tort claims. Specifically, Brooks alleged on behalf of D.H. that Officer Martin violated her civil rights by filing false charges against Brooks for the purpose of depriving him of custody. Brooks also asserted that Officer Martin violated his civil rights by arresting him without probable cause. In addition, Brooks alleged that Officer Martin engaged in a conspiracy with Tamara and Tracy to deprive him of custody by arresting him without probable cause. Further, Brooks asserted claims of malicious prosecution and abuse of discretion, based on the absence of probable cause for his arrest. Sharon alleged that Officer Martin violated her civil rights by using excessive force against her during the incident. She also asserted a claim of battery.

Officer Martin filed a motion for summary judgment claiming entitlement to qualified immunity as a city employee pursuant to Arkansas Code Annotated section 21–9–301 (Repl.2004). Brooks and Sharon resisted the motion, and the parties relied on affidavits, depositions, photographs, and a videotape of the incident to support their respective positions.

According to Officer Martin's deposition testimony, when he met Tamara and Tracy at the apartment complex, he inquired as to who had custody of the child. He said that the women told him that Tamara and her husband were separated but that there were no papers [5]establishing custody in either parent. Officer Martin stated that he advised them that he could not become involved in a custody dispute but that he would keep the peace if trouble erupted. Officer Martin then positioned himself by the concession stand at the ballpark. According to Officer Martin, he heard screaming and saw Tamara and Sharon trying to take D.H. from one another. Officer Martin stated that he told them to calm down but that they continued to fight over the child. He said that he took the crying child in his arms for her own safety. Officer Martin stated that, as between the mother of the child and a grandmother, he handed D.H. to Tamara, who began walking back to the apartment complex. Officer Martin testified that Sharon remained hysterical and that she kept trying to grab hold of the child, saying that she had custody papers in her vehicle. Officer Martin said that he repeatedly told Sharon to back off and to retrieve the papers she claimed to possess.

In her deposition, Sharon testified that Tracy picked up D.H. and hugged her and that all was well until Tracy walked away with D.H. and gave her to Tamara. Shar-

on admitted that she tried to physically regain control of D.H. from Tamara. She said that Tamara called to Officer Martin, who then grabbed her arms. Sharon denied, however, that she was reaching for D.H. when Officer Martin pulled her away from Tamara. She testified that she told Officer Martin that she had custody papers in her vehicle and that Martin advised her to get them.

Sharon further testified that Officer Martin allowed Tamara to leave with D.H., despite her protestations. Sharon said that she followed Tamara to the apartment complex ⌊6 and that Officer Randle stopped her from opening the door of the black truck. In terms of her injuries, Sharon testified that Officer Martin grabbed and squeezed her arms several times, and she submitted photographs showing large bruises on her upper arms. She stated that she suffered from depression as a result of the incident and that her doctor had prescribed medication as treatment for that condition.

By deposition, Brooks testified that he received a phone call from his brother, who alerted him that Tamara was taking D.H. away in a black truck. He said that he rushed to the apartment complex and that he blocked the pathway of the black truck with his vehicle, a white truck. Brooks stated that he struck the black truck because, in his haste to recover D.H., he exited his truck without placing the ignition in the park position. Brooks further testified that he had a copy of the safety plan with him and that the social worker who came to the police station was willing to allow him to take custody of D.H. He said that Officer Martin, however, told the social worker that he could not exercise custody because of the charges lodged against him.

In an affidavit, Officer Randle stated that he was watching a game at the ballpark when he heard loud voices. He saw Officer Martin and Sharon walking at a hurried pace and that Sharon appeared to be arguing with Officer Martin. Officer Randle said that he followed them to the apartment complex and observed Sharon yelling at someone in a black truck and pulling on the door handle. He stated that he and Officer Martin kept Sharon from opening the door of the black truck. Officer Randle said that he spoke with Tamara and told her that ⌊7 she could leave in order to restore peace. He stated that, as Tamara was leaving in the black truck, a white truck crossed the center line and collided with the front of the black truck. Officer Randle said that Brooks jumped from the driver's side of the white truck and over the hood of the white truck and started pulling on the driver's door of the black truck. He said that he and Officer Martin pulled Brooks away from the black truck and placed him under arrest for vehicular assault.

At the hearing on appellant's motion for summary judgment, the parties provided the court with a videotape of the incident that Tracy filmed after she handed D.H. to Tamara. The tape begins at a point where Officer Martin is holding the child. Sharon is seen moving from side to side and grasping at the child's arms. Officer Martin passes D.H. to Tamara, and Sharon continues to grab for the child. The tape also captures Officer Leon trying to keep Sharon away from Tamara and the child, and Sharon is shown pushing Officer Leon. Tamara then begins to move away. Sharon attempts to block her path, and Tamara yells for the officers to get Sharon away from her. The tape shows Officer Martin pull Sharon to the side and off camera. Next, the tape shows Officer Martin and Sharon walking together at a distance from Tamara. Then, Tamara and the child begin to run. Throughout the tape,

one can hear someone yelling at Sharon that "the papers were thrown out and you know it." Next, the tape captures Sharon standing near the black truck as it leaves the area. Following this, the tape shows the aftermath of the collision. Brooks's truck is not damaged, but the ⌊8front bumper of Tamara's truck is dented in the center. Brooks's truck is also positioned directly in front of Tamara's truck that is stopped in the right lane of traffic.

The trial court issued a letter opinion denying appellant's motion for summary judgment. The court found that summary judgment was not appropriate because material facts remained in dispute. Officer Martin has appealed the subsequent order entered by the trial court denying the motion for summary judgment on his claim of qualified immunity.

On appeal, Officer Martin contends that he is entitled to qualified immunity as a matter of law on all of the claims asserted against him and that the trial court erred by denying his motion for summary judgment. Ordinarily, the denial of a motion for summary judgment is neither reviewable nor appealable. *See City of Fayetteville v. Romine,* 373 Ark. 318, 284 S.W.3d 10 (2008). However, that general rule does not apply where the refusal to grant a summary-judgment motion has the effect of determining that an appellant is not entitled to immunity from suit. *Gentry v. Robinson,* 2009 Ark. 634, 361 S.W.3d 788. The rationale justifying an interlocutory appeal on this issue is that the right to immunity from suit is effectively lost if the case is permitted to go to trial. *Simons v. Marshall,* 369 Ark. 447, 255 S.W.3d 838 (2007).

Officer Martin's claim of qualified immunity is based on Arkansas Code Annotated section 21-9-301, which provides:

> (a) It is declared to be the public policy of the State of Arkansas that all counties, municipal corporations, school districts, special improvement districts, and all other political subdivisions of the state and any of their boards, commissions, agencies, authorities, or other governing bodies shall be ⌊9immune from liability and from suit for damages except to the extent that they may be covered by liability insurance.
>
> (b) No tort action shall lie against any such political subdivision because of the acts of its agents or employees.

In cases involving immunity under section 21-9-301, we apply the same analysis that is utilized when addressing the issue of qualified immunity of state employees under Arkansas Code Annotated section 19-10-305 (Repl.2007). *Romine, supra.*[1] Also, qualified immunity under Arkansas law is akin to its federal counterpart and rests on the same principles as federal law. *See Baldridge v. Cordes,* 350 Ark. 114, 85 S.W.3d 511 (2002).

The purpose of qualified immunity is to allow public officers to carry out their duties as they think right, rather than acting out of fear for their own personal fortunes. *Greiner v. City of Champlin,* 27 F.3d 1346 (8th Cir.1994). Toward this end, police officers have qualified immunity from liability in their individual capacity unless they violate a clearly established right of which a reasonable person would know. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A motion for summary judgment based upon qualified immunity is precluded only when the plaintiff has asserted a

1. The supreme court has identified one difference between the immunity granted under section 19-10-305 and that accorded under section 21-9-301. While the former includes an element of malice, the latter does not. *Romine, supra.*

constitutional violation, demonstrated that the constitutional right is clearly established, and raised a genuine issue of fact as to whether the official would have known that the conduct violated that clearly established right. *Smith v. Brt,* 363 Ark. 126, 211 S.W.3d 485 (2005). Whether the officer is immune ordinarily should ⌊10 be decided by the court long before trial, *Hunter v. Bryant,* 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991), or else much of the benefit of the rule will be lost. *Greiner, supra.*

Of course, our courts have repeatedly held that summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *Gentry, supra.* On appellate review, we determine whether summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. *City of Farmington v. Smith,* 366 Ark. 473, 237 S.W.3d 1 (2006). We view the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Brt, supra.* Our review focuses not only on the pleadings but also on the affidavits and other documents filed by the parties. *Dodson v. Taylor,* 346 Ark. 443, 57 S.W.3d 710 (2001). In viewing the evidence in the light most favorable to the party resisting the motion, we are not obliged to ignore incontrovertible evidence that is depicted on a videotape. *Wallingford v. Olson,* 592 F.3d 888 (8th Cir.2010) (citing *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)).

The issue of whether a party is immune from suit is reviewed de novo on appeal. *Romine, supra.* Whether summary judgment on grounds of immunity is appropriate on a particular set of facts is purely a question of law. *Gentry, supra.* Although the determination of whether there is a genuine issue of material fact is a question of law under these ⌊11 circumstances, it is a legal question that sits near the law-fact divide. *Id.* (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

We first address the propriety of summary judgment with regard to the claims presented by Brooks. Several of Brooks's claims are based on the Arkansas Civil Rights Act of 1993,[2] while others involve claims of malicious prosecution and abuse of process. Each of these claims, however, are premised on the assertion that Martin lacked probable cause to arrest him for either driving on the wrong side of the road, assault, or endangering the welfare of a child. The right not to be arrested or prosecuted without probable cause is a clearly established constitutional right. *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). However, an arresting officer is entitled to qualified immunity if the arrest was objectively reasonable, and officers of reasonable competence could disagree on whether the probable-cause test was met. *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Probable cause exists if "at the moment the arrest was made ... the facts and circumstances within [a police officer's] knowledge and of which [the officer] had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that the person arrested committed the crime with which he was charged. *Baldridge,* 350 Ark. at 120–21, 85 S.W.3d at 515 (quoting *Beck v. Ohio,*

2. *See* Arkansas Code Annotated section 16–123–105(a) (Repl.2006).

379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). As this standard makes clear, there need not be actual probable cause for an officer to be shielded by qualified immunity, as an objectively reasonable belief that there was probable cause is ⌊12enough. *Id.* Also, probable cause may be based on the collective knowledge of police officers, and therefore, need not rest solely upon the information of the officer who actually makes the arrest. *Ray v. State,* 304 Ark. 489, 803 S.W.2d 894 (1991).

Here, one of the charges lodged against Brooks was for driving on the wrong side of the road. Arkansas Code Annotated section 27–51–301(a) (Supp.2009) provides that, subject to certain exceptions not applicable here, a vehicle shall be driven upon the right half of the roadway. In his affidavit, Officer Randle stated that the vehicle driven by Brooks crossed the center line of the road and collided with the front of Tamara's black truck. By his own admission, Brooks stated in his deposition that he blocked the pathway of the black truck. The videotape also places Brooks's vehicle on the left side of the roadway. Thus, the indisputable facts show that Brooks drove on the wrong side of the road in contravention of section 27–51–301(a). Therefore, probable cause existed for Officer Martin to arrest and charge Brooks with a violation of the statute. We need not decide whether there was probable cause for Brooks's arrest on the other charges. Once probable cause exists for an arrest on one offense, it is immaterial whether there was probable cause for arrest on any other offenses. *See Baldridge, supra.* Because the undisputed facts demonstrate probable cause for Brooks's arrest, Officer Martin was entitled as a matter of law to qualified immunity on the claims asserted by Brooks, and the trial court erred in failing to grant Officer Martin's motion for summary judgment.

⌊13Turning to Sharon's claims, she alleged that Officer Martin violated her rights under the Arkansas Civil Rights Act by employing excessive force against her. She also asserted a claim of battery. At the outset, we hasten to hold that Sharon's battery claim survives the motion for summary judgment. The supreme court has consistently held that section 21–9–301 provides city employees with immunity from civil liability for negligent acts but not for intentional acts. *See Romine, supra; Brt, supra; Deitsch v. Tillery,* 309 Ark. 401, 833 S.W.2d 760 (1992). Battery is an intentional tort. *See Adams v. HLC Hotels, Inc.,* 328 Ark. 108, 941 S.W.2d 424 (1997). In oral argument, Martin's counsel questioned the distinction that is made between intentional and negligent acts and argued that the legislature intended for city employees to be immune from claims involving intentional torts as well. Counsel acknowledged, however, that this argument was not raised below. As a rule, we do not address issues that are raised for the first time on appeal. *Stanley v. Hogan,* 2010 Ark. App. 107, 2010 WL 374386. Thus, we affirm the order of summary judgment on Sharon's battery claim.

Proceeding to a discussion of Sharon's civil-rights claim, the right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person. *Crumley v. City of St. Paul,* 324 F.3d 1003 (8th Cir.2003). Thus, excessive-force claims are analyzed under the Fourth Amendment's standard of reasonableness, which requires a careful balancing of the nature and quality of an intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham v. Connor,* 490 U.S. 386, 109 S.Ct.

1865, 104 L.Ed.2d 443 (1989). The test is whether the amount of force used was objectively reasonable under the circumstances. *Id.* Further, as an objective inquiry, it is made without regard to the officer's underlying intent or motivation. *Samuelson v. City of New Ulm,* 455 F.3d 871 (8th Cir.2006). The issue is judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight. *Graham, supra.* This standard includes allowance for the fact that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary." *Id.* at 396–97, 109 S.Ct. 1865. Therefore, not every push or shove violates the Fourth Amendment, even if such actions may later seem unnecessary in the peace of a judge's chambers. *Id.* Circumstances such as the severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect is resisting arrest are all relevant to the reasonableness of the officer's conduct. *Crumley, supra.* Injuries that are attributable to a plaintiff's own actions do not demonstrate excessive use of force by police. *Greiner, supra.* And, if the complaining party's injuries are likely explained by his or her own actions, the allegations cannot create an issue of material fact as to whether the officer used excessive force. *Brandt v. Davis,* 191 F.3d 887 (8th Cir.1999). Also, a de minimus use of force is insufficient to support the finding of a constitutional violation. *Crumley, supra* (holding that injury was considered de minimus where tight handcuffs caused bleeding); *see also Wertish v. Krueger,* 433 F.3d 1062 (8th Cir.2006) (holding that minor scrapes and bruises and a less-than-permanent aggravation of a bad shoulder were de minimus injuries); *Greiner, supra* (holding that severed tendon was a de minimus injury).

Viewing the facts in the light most favorable to Sharon, we accept as true the predicate facts that Officer Martin grabbed Sharon's arms multiple times and that his actions left large bruises on her arms. The question we must decide is whether it was objectively reasonable for Officer Martin to restrain Sharon with that degree of force. Sharon acknowledged in her deposition that she attempted to forcibly remove the child from Tamara's arms. Without question, the videotape also shows that Sharon continued grasping for the child and blocking Tamara's exit and that she disobeyed the officers' commands to refrain from that behavior. We believe that it was objectively reasonable for Officer Martin to employ some force to protect the child and to diffuse the volatile situation. While the evidence demonstrates that Sharon experienced some degree of physical injury in the form of bruising, her own struggles prompted Officer Martin to take action, and the evidence does not indicate the kind of harm that rises above the level of a de minimus injury. Sharon's own actions and the fact that she sustained only a slight injury conclusively undermine her claim of excessive force. Accordingly, we hold that, as a matter of law, the facts do not support a claim of excessive force. While Sharon also contends that she suffered from depression, damages for this type of harm cannot be considered without first establishing that she was subjected to excessive force. In sum, we reverse the trial court's refusal to grant the motion for summary judgment on this claim.

Affirmed in part; reversed in part.

PITTMAN and BAKER, JJ., agree.